POOLER et al. v. HYNE.

(Circuit Court of Appeals, Seventh Circuit. January 6, 1914.)

No. 1945.

1. JUDGMENT (§ 17*)—VALIDITY—JURISDICTION OVER PARTIES.
    Under the law of Indiana, a decree is a nullity as against a defendant as to whom the summons was returned "not found" and who was not otherwise served, and also as against the interests of other defendants named but who had died before the suit was commenced.
    [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 25–33, 157, 422; Dec. Dig. § 17.*]

2. PROCESS (§ 103*)—PUBLICATION—DESIGNATION—MAIDEN NAME.
    Under the law of Indiana, a suit to quiet title may be maintained against a nonresident married woman by her maiden name, where she was last known in the state by that name, and where the instrument through which she claims is of record in that name.
    [Ed. Note.—For other cases, see Process, Cent. Dig. §§ 129, 131; Dec. Dig. § 103.*]

3. PERPETUITIES (§ 4*)—CREATION OF REMAINDER—VALIDITY.
    Under Rev. St. Ind. 1843, p. 425, § 68, providing that "no remainder shall be created upon an estate for life of any other person or persons than that of the grantee or devisee of such estate, unless such remainder be an estate in fee," a deed to a trustee creating a remainder in fee after the termination of a life estate reserved in the grantor and a succeeding life estate in his wife is valid.
    [Ed. Note.—For other cases, see Perpetuities, Cent. Dig. §§ 4–44; Dec. Dig. § 4.*]

4. JUDGMENT (§ 686*)—PERSONS CONCLUDED.
    A consent decree against the grantor sustaining the validity of a deed is binding on him and his subsequent devisee of the land conveyed therein.
    [Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1209; Dec. Dig. § 686.*]

5. LIFE ESTATES (§ 8*)—ADVERSE POSSESSION—CLAIM OF FEE—NOTICE TO REMAINDERMEN.
    The repudiation by a life tenant of his tenancy and his claim to an estate in fee does not make his possession or that of his grantee adverse as to the remaindermen until notice of the repudiation is brought home to them.
    [Ed. Note.—For other cases, see Life Estates, Cent. Dig. §§ 24–28; Dec. Dig. § 8.*]

6. EQUITY (§ 87*)—LACHES—FOLLOWING STATUTE OF LIMITATIONS.
    The equitable doctrine of laches does not necessarily follow the statute of limitations, and a complainant may be denied relief in equity although less than the statutory period of limitations has run against his claim.
    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 242–244, 395; Dec. Dig. § 87.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**7. Quieting Title (§ 29*)—Cross-Bill—Laches—Parties Against Whom Laches May be Pleaded.**

The owner of a quarter section of land in 1846 conveyed the same in trust to be held for the sole use and benefit of himself during his life and afterward of his wife during her life, with remainder in fee to her children by a former marriage. He died in 1849 leaving a will by which, after devising other land, he made his wife his sole devisee and legatee. The widow and her children continued to reside on the land for a number of years, and in 1865 she sold the same for its full value, and gave a warranty deed. At that time her children by her first marriage were all of age and some or all lived with her. From that time her grantee and his successors in interest were in possession of the land and made improvements and paid the taxes thereon. The widow died in 1897. In 1909 her surviving children on an ex parte application secured the appointment of a new trustee under the deed of trust and an order for the execution of a deed by him to them which they placed on record. After the death of their mother the land was sold by the claimants in possession to others who bought in good faith and paid full value therefor, and had increased in value from $8,000 to $20,000. The adverse claimants in possession brought a suit to quiet title in which the remaindermen filed a cross-bill. There was evidence tending to show that their mother had always claimed the land in fee under her husband's will and not under the trust deed, but owing to the long lapse of time all persons who were in position to know the facts, and under what arrangement, if any, between her and defendants it was sold, were dead. *Held*, that defendants were in effect the attacking parties, and their cross-bill was subject to the defense of laches, and that under the circumstances their delay of 12 years before asserting their claim barred them of any right to recover the land and the rents and profits thereof.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. § 63; Dec. Dig. § 29.*]

Appeal from the District Court of the United States for the District of Indiana; Albert B. Anderson, Judge.

Suit in equity by Jennie Hyne against Cecelia Lukens Pooler, William Howard, Jr., Cecelia Howard Hacket, Mary Howard Barbour, Julia E. Howard Osborn, Laura Howard Cox, Birdie Bell Howard Simpson, and Tillman Overton Howard. Decree for complainant, and defendants appeal. Affirmed.

See, also, 202 Fed. 194.

Appellee filed her bill of complaint against Cecelia Lukens Pooler and Isabella Lukens Howard to quiet title to the west half of the northwest quarter of section 12, township 4 south, range 13 west, in Posey county, Ind. At the same time Silas Hyne filed his complaint against the same parties to quiet title to the east half of the same quarter section. After these suits had been instituted, Isabella Lukens Howard died, and her heirs, who are the appellants other than Cecelia Lukens Pooler, were substituted as parties defendant. In each suit appellants filed a cross-bill, asking to have title quieted in themselves. Each cause was referred to the master in chancery, and before him the causes were treated as consolidated for the purpose of taking the evidence and making a report of the facts. Decrees were rendered in favor of the Hynes, and appellants have prosecuted an appeal in each case. By agreement the result of this appeal is to be determinative also of the case of Silas Hyne.

In his report the master found the following facts:

1. In 1845 Joshua Overton lived in Posey county, Ind. He was then over 70 years old, and in that year married Fidelia Lukens, a widow 31 years old and mother of four children by her former marriage, namely, Eliza, Isabella, Cecelia, and William Clark Lukens. On June 16, 1846, Joshua made a deed

of bargain and sale of the quarter section of land involved in these controversies and also 80 acres in an adjoining section, to one James T. Walker "to have and to hold the above described premises to the only use, benefit and behoof of the said James T. Walker, his heirs and assigns forever, in trust to and for the uses and purposes hereinafter mentioned, declared and specified, that is to say, that the said Joshua Overton of the first part shall have the right and be permitted without hindrance or molestation to use, possess and enjoy the said tracts of land and every part thereof, together with the appurtenances, either by himself or his tenants, and to receive the rents and profits thereof and appropriate and dispose of the same to and for his own use and benefit so long as the said Joshua Overton of the first part shall live, and that after the death of the said Joshua Overton, the wife of the said Joshua Overton, namely, Fidelia Overton, shall have the right and be permitted without hindrance or molestation to use, possess and enjoy the said tracts of land' and every part of them, together with the appurtenances, either by herself or her tenants, and to receive the rents and profits thereof and appropriate and dispose of the same for her own benefit and use during her own lifetime; and after the death of the said Fidelia Overton, the said tracts of land to be conveyed by the said James T. Walker, or his legal representatives, in fee simple to Eliza Lukens, Isabella Lukens, Cecelia Lukens, William Clark Lukens and their heirs and assigns."

2. At the March term, 1848, of the circuit court of Posey county, Ind., Joshua Overton brought suit against James T. Walker, Fidelia Overton, and the four Lukens children, and charged in his bill that he had signed the deed to Walker, trustee, but had never delivered it, and that by fraud the instrument came into possession of Walker and was thereafter lodged for record in the recorder's office of Posey county and therein recorded. Overton's prayer was that Walker be decreed to reconvey the land. All the defendants were duly summoned to appear and answer. Walker and Fidelia Overton appeared by counsel and filed answers. For the minor children the court appointed a guardian ad litem, who filed an answer in their behalf. And after evidence was taken a decree by agreement was entered in which it was "ordered, adjudged, and decreed that Seth M. Leavenworth be, and he is hereby, appointed a commissioner to make to the said Joshua Overton a deed for the east half of the northwest quarter of section 11, township 4 south, range 13 west, and that the deed in complainant's bill mentioned as to said half quarter section be, and the same is hereby, declared null and void, and as to the rest and residue of the land in said deed mentioned, such deed is adjudged good and valid."

3. On August 9, 1849, Joshua Overton duly made his last will, in which he devised to John Benjamin Overton, a son born to him by his wife Fidelia Overton, the east half of the northwest quarter of section 11, township 4 south, range 13 west. And the residue of said will was as follows: "I also give and bequeath to my present wife, Fidelia Overton, all the estate, real, personal and mixed, except the above mentioned parcel of land, which I may own, possess or be entitled to at the time of my death, either in law or in equity, to have and to hold the same to her and her heirs forever." Joshua Overton died on September 1, 1849. His said will was duly probated, and his estate was duly administered and closed at the May term, 1852, of the probate court of Posey county.

4. Fidelia Overton continued to reside on the 160-acre tract in section 12 until about 1856, and thereafter she rented the land to tenants and collected the rents, and her children during the greater part of that time lived with her on that land. Fidelia Overton exercised all the rights of a fee-simple owner of the 160 acres, and was exercising such rights on the 17th day of November, 1865, "and treated the deed of Joshua Overton to Walker, trustee, as ineffective to divest the title of said Joshua Overton, apparently by reason of its being invalid, because the said Walker was a nominal trustee, and the attempt made in said deed to vest the remainder in fee in Cecelia, Isabella, Eliza, and William Clark Lukens was void because in contravention of section 68 of article 3, page 425, of the Revised Statutes of 1843, in that such remainder would have been created upon an estate for the life of said Joshua Overton, a person other than the grantee in said deed, he being grantor in said deed." On said 17th day of November, 1865, Fidelia conveyed the 160 acres

by warranty deed to Lewis A. McDonald for the sum of $5,000, and recited in said deed that she conveyed as the heir of said Joshua Overton, deceased, as would fully appear by reference to his will bearing date August 9, 1849, and on record in the clerk's office of Posey county, on pages 213 and 214 of Book B of Wills. At the time of the conveyance to McDonald the $5,000 paid by him was the fair cash value of the fee-simple title to said 160 acres. Said deed was duly recorded in the recorder's office of Posey county, Ind.

5. Immediately upon delivery of the deed to him McDonald went into possession of said 160 acres of land, and thereafter executed several warranty mortgages of the fee. In 1870 Fidelia Overton obtained a judgment against McDonald, and execution was levied upon said 160-acre tract of land, and said judgment was assigned by Fidelia to Ford, Fitton & Co., who were the holders of a mortgage executed by McDonald. That mortgage was foreclosed in 1874, and through the foreclosure the title of McDonald passed, as a fee-simple title, to Herbert and Florence Fitton.

6. Walker, trustee, died in 1877; Fidelia Overton, on April 2, 1897; William Clark Lukens, on July 25, 1882; Eliza Lukens, on February 10, 1908. On April 15, 1909, John Benjamin Overton, the half-brother, conveyed all his interest in said 160 acres to Isabella Lukens Howard and Cecelia Lukens Pooler. And the shares of William and Eliza passed by inheritance to Isabella and Cecelia.

7. At the May term, 1898, of the circuit court of Posey county, Ind., Herbert and Florence Fitton began suit against Fidelia Overton and her four children by the name of Lukens to quiet title to the 160 acres. Notice by publication was given to Fidelia Overton, Isabella Lukens, Cecelia Lukens, and William Clark Lukens as being nonresident defendants. Summons for Eliza Lukens was placed in the hands of the sheriff of Posey county and returned "not found." On May 30, 1898, the Posey county circuit court adjudged that the Fittons were owners in fee of the 160 acres and decreed that their title be forever set at rest.

8. On January 2, 1898, the Fittons conveyed by warranty deed to Jennie Hyne, the west half of said quarter section for $4,000. On June 8, 1898, the east half was similarly conveyed to Silas Hyne for $4,000.

9. While the Fittons were in possession, they executed warranty mortgages of the fee of said quarter section. And Silas Hyne has done likewise with the 80 acres conveyed to him.

10. When McDonald went into possession on November 17, 1865, the 160 acres were in a run-down condition, about one-half thereof being under cultivation and the remainder being in timber. During McDonald's occupancy he tore down an old building, erected two new buildings, and also built fences and laid a tile ditch in place of a wooden ditch. McDonald paid the taxes on said farm during his occupancy, and the Fittons paid the taxes during theirs, and Silas Hyne and Jennie Hyne paid the taxes on their respective 80-acre tracts during their occupancies. During the occupancy of McDonald he was reputed and commonly believed in the neighborhood to be the owner in fee simple of said 160 acres of land. And the same thing was true with respect to the Fittons and the Hynes during their respective occupancies. From time to time McDonald and the Fittons and the Hynes have cut down and removed and disposed of for their use parts of the timber on said tracts of land.

11. Throughout the period from November 17, 1865, to the time of the trial of this suit McDonald and the Fittons and the Hynes have respectively been in the visible, open, continuous, notorious, and adverse possession of said land.

12. At the April term, 1909, of the circuit court of Posey county, Ind., Cecelia Lukens Pooler and Isabella Lukens Howard filed their ex parte application for the appointment of a trustee as successor to Walker, trustee, and such proceedings were had that the court appointed one Bozeman as such successor in trust; and thereafter, upon ex parte application of Bozeman, the court directed him to execute a deed to Cecelia and Isabella, which he did on September 2, 1909. The complaint in this suit was filed on November 4, 1909.

13. On November 17, 1865, Eliza, Cecelia, Isabella, and William Clark Lukens had each attained majority, and at that time one of them was living at Evansville, Ind., and two or more of them were living with their mother,

Fidelia Overton, at Vincennes, Ind. In 1868 Fidelia Overton and Cecelia Lukens Pooler went to California and lived in Santa Rosa until the time of Fidelia's death in April, 1897. Thereafter Cecelia continued to live in Santa Rosa until 1898, since which date she has resided in San Francisco. None of the other children of Fidelia Overton resided in the vicinity of the land in question at any time after November 17, 1865. None of the children who were living in 1898 had any knowledge of the suit to quiet title prosecuted by the Fittons in the Posey county circuit court, until after the commencement of this suit.

James T. Walker, of Evansville, Ind., and J. T. Hanna, of Chicago, Ill. (Walker & Walker, of Evansville, Ind., of counsel), for appellants.

G. V. Menzies, W. S. Jackson, and R. U. Barker, all of Mt. Vernon, Ind., for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). [1, 2] Appellee places some reliance upon the decree of the Posey county circuit court in the suit by the Fittons to quiet title. But the decree was a nullity as against Eliza Lukens who was "not found," and also as against Fidelia Overton and William Clark Lukens who had died prior to the institution of that suit. Thompson v. McCorkle, 136 Ind. 484, 34 N. E. 813, 36 N. E. 211, 43 Am. St. Rep. 334. And appellants claim that the decree is not even good as against Cecelia and Isabella, on the ground that notice by publication given to a married woman by her maiden name is not sufficient. But, under the Indiana decisions, it was sufficient and proper to publish notice to Cecelia and Isabella under the names they had been known by in Posey county up to the time of their departure therefrom, especially as the outstanding interest to be affected by the Fittons' suit was a matter of record in the names used in the publication notice. Jones v. Kohler, 137 Ind. 528, 37 N. E. 399, 45 Am. St. Rep. 215; Baugher v. Woollen, 147 Ind. 308, 45 N. E. 94. The decree was therefore effectual to bar whatever interest Cecelia and Isabella had in 1898; but, inasmuch as they subsequently acquired other interests by inheritance from their sister Eliza and by conveyance from their half-brother John B. Overton, the decree is only a partial defense of appellee's claim of title.

[3] Affirmance of the decree is also asked on the ground that the deed to Walker was void for the reasons stated by the master in the fourth finding. We agree that Walker was only a nominal trustee and that the validity of the deed depends on the answer to the question whether Overton could have made a valid deed directly to the beneficiaries of the trust. Section 68 of article 3, page 425, of Revised Statutes of 1843, so far as applicable, reads as follows:

"No remainder shall be created upon an estate for life of any other person or persons than that of the grantee or devisee of such estate, unless such remainder be an estate in fee."

Although the deed is in substance a conveyance of an estate for life to Fidelia, with remainder over in fee to the four Lukens children, with a reserved estate for the life of the grantor Overton, appellee contends that the remainder was created upon an estate for life of the grantor alone and therefore was violative of the statute.

But, as we read the statute, a remainder could lawfully be created even upon a life estate reserved to the grantor alone, provided that "such remainder be an estate in fee." And since the remainder in the deed in question was an estate in fee, we are of the opinion that the deed was valid.

[4] But if there is any doubt about the validity of the Overton deed to Walker, trustee, the decree of the circuit court of Posey county, rendered in 1848, and described in the second finding, was sufficient to estop Joshua Overton from claiming that the land was his to devise, and Fidelia Overton from claiming that her title and possession came through Joshua's will and not through the deed. Bruce v. Osgood, 154 Ind. 375, 56 N. E. 25.

[5] So, in 1849, after Joshua's death, Fidelia in point of law came into possession as a life tenant under Joshua's deed, no matter what she may have believed or asserted with respect to her having a title in fee as devisee under Joshua's will. Appellants contend that the finding that Fidelia from 1849 to 1865 claimed and exercised all the dominion of an owner in fee and the finding that the possession of Fidelia's grantees was adverse to the remaindermen are not supported by the evidence. We have examined the evidence on these points and confess that it is rather meager and obscure (we shall advert to this condition of the evidence later), but Fidelia's deed to McDonald unmistakably established that on November 17, 1865, she solemnly asserted ownership in fee, deraigning her title through Joshua's will and not through his deed; and from the same evidence and from the further evidence that McDonald paid the full cash value of the land at the time, it is well established that McDonald entered into possession believing that he had lawfully become the owner of the fee. His possession was unquestionably adverse to all the world except the remaindermen named in the Overton deed to Walker, trustee. But, since that deed was properly of record, McDonald was chargeable with notice of the remainder in fee, and therefore his possession as grantee of Fidelia, who in truth was only a life tenant, was not adverse to the remaindermen, and the statute of limitations began to run as against them only in April, 1897, on the death of Fidelia. That is, if a life tenant repudiates his tenancy and asserts a claim to the fee, inasmuch as the possession of the life tenant and those who take under him is on the trust of holding and defending possession in the interest of the remaindermen, no repudiation of the life estate is of any effect against the remaindermen until notice of such repudiation is brought home to them. Haskett v. Maxey, 134 Ind. 182, 33 N. E. 358, 19 L. R. A. 379; Herring v. Keneipp (Ind.) 102 N. E. 834; 1 Cyc. 1032, 1056; 16 Cyc. 616, 637; Zeller v. Eckert, 4 How. 290, 11 L. Ed. 979; and citations in 4 Rose's Notes, 505; Mettler v. Miller, 129 Ill. 630, 22 N. E. 529; Cassem v. Prindle, 258 Ill. 11, 101 N. E. 241. And in the present case the master did not find that the remaindermen had notice of the repudiation of the life tenancy.

[6] Although in Indiana the statutory period for adverse possession is 20 years, and conceding that the statute in this case did not begin to run against appellants until 1897, it does not necessarily follow that the part of their claim which was not barred by the Fit-

tons' decree must be recognized in a court of equity. The equitable doctrine of laches is well stated and explained in Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214, a leading case. A full collection of the authorities is given in 16 Cyc. 152 et seq. And the Supreme Court of Indiana, citing and relying on Patterson v. Hewitt, supra, has stated and applied the doctrine of laches in its broadest aspects. Ryason v. Dunten, 164 Ind. 85, 73 N. E. 74.

While courts and text-writers have said that it would not be well to limit and restrain the doctrine by any attempt at precise definition, and that the question is to be determined by the particular facts of each case, yet the general nature of the doctrine may be appreciated in a negative way by recalling what it is not. Though the idea of delay is involved, the doctrine of laches is not an application of any statute of limitations, for, if the statutory time had fully run, no consideration would need to be given to the conduct and position of the parties. And though the conduct of the parties is to be weighed, the doctrine of laches is not coterminous with estoppel by conduct, for if one's conduct at the time of another's entry upon land prevented the pressing of a claim, no consideration would need to be paid to the lapse of time thereafter. That is, although the conduct of the complainant has not created an estoppel in pais, and although less than the statutory period of limitations has run, a court of conscience will compare the conduct and the relative positions of the antagonists, and if on a balancing of the scales of justness and fair dealing the pointer inclines toward the defendant, the chancellor will refuse to be moved by the prayer of the complainant.

[7] Appellants contend that, because they were brought into court as defendants, the doctrine of laches, which is merely a shield and not a weapon of offense, cannot be applied to them. But appellants were really the attacking parties. They came into Posey county and disturbed a repose of nearly 60 years by procuring the appointment of Bozeman as trustee in succession to Walker, and putting the deed from Bozeman to themselves on record. This was an invasion and a drawing up of the line of battle. And when the Hynes people invited appellants into court, they filed their cross-bill in which they affirmatively prayed for title, possession, and an accounting of rents and profits. The decree from which they are now appealing adjudged that there was no equity in their cross-bill and dismissed it for lack of merit. Unless they can get rid of that part of the decree, they are in no position to attack the part which upholds the original bill. Consequently the doctrine of laches is applicable.

Two well-recognized phases of the doctrine apply to this case. One is the change in the position of the occupiers of the land and the increase of value during the interval. 16 Cyc. 161, 162. Fidelia Overton died in April, 1897. Thereupon appellants' right of possession accrued under the deed made 51 years before. No inquiry was made, no move was inaugurated during more than 12 years. Absence from the state and lack of means are given as reasons for the delay. But these are reasons that cannot be accepted. 16 Cyc. 169. A suitor with no money may have relief in equity. And furthermore,

appellants show no change in their circumstances throughout the time from the death of Fidelia down to the bringing of this suit in November, 1909. So, with the right of possession accruing to them in April, 1897, they were charged with the duty of learning what was going on with respect to possession. During those 12 years they knew that some one other than themselves was paying the taxes, keeping up repairs, and improving the estate, if those things were being done at all. And if the taxes were not kept up, 12 years were a double allowance for losing the fee through tax sales and deeds and decrees thereon. The Hynes people did not buy from the Fittons until the year after Fidelia's death. If appellants had moved with sufficient promptness, the Hynes people certainly never would have put their money into paying the full value of the land together with the full value of all of the improvements that had been made by McDonald and the Fittons, at least until after the question of title had been completely settled. But not only were the present occupiers permitted to come into possession during the silence of appellants, but during their continued silence this estate of 160 acres has increased from a value of $8,000 to a value of $20,000, and appellants are not merely demanding the recovery of a $20,000 estate but they also are demanding from the occupiers an accounting for rents and profits of more than $1,000 a year. And inasmuch as it is unquestionable that McDonald and the Fittons and the Hynes have all acted in good faith and have not only paid the full value of the fee at the time of their respective purchases but have greatly increased the value of the estate by improvements and cultivation, while the appellants have never invested a dollar and are not even remotely of the blood of Overton, the appeal of conscience is all on the side of the Hynes.

The other phase is the effect of the delay upon the state of the evidence respecting what occurred between 1849 and 1865. 16 Cyc. 163, 164. Joshua Overton died in 1849. Fidelia was devisee and executrix. Joshua's estate was closed in the probate court in 1852. Fidelia and her children remained in Posey county until 1856. They lived in neighboring counties in southern Indiana until the land was deeded to McDonald in 1865, whereupon Fidelia and her children, who were then all of age, left the state. The master finds that Fidelia, after Joshua's death, claimed and exercised the dominion of owner in fee of the 160-acre estate. As we have hereinabove noted, this finding is not very clearly supported by the testimony. The witnesses were old men, upwards of 70 years at the time of giving their testimony; but that would only make them lads in their teens when Joshua Overton died, and while his widow and stepchildren occupied the land between the time of Joshua's death and their departure from Posey county. This means that all of the people in the neighborhood of the land who were adults and who were conducting the business of the community in those days have long been dead. If in truth the Lukens children had notice of legal advice given to their mother that the deed to Walker, trustee, was void and that their mother had title in fee as devisee under Joshua's will; or, if in 1865 the children received a portion of the consideration paid by McDonald for the land; or if

without receiving any of McDonald's money they had notice of the terms of the sale to McDonald and remained silent—an estoppel in pais would have been created, which would at once have rendered the possession of McDonald and his successors impregnable, and no running of time would be necessary in their behalf. It seems probable that some one or more of the above supposititiously stated circumstances must have existed, for Fidelia and her children were living together in those days and the disposition of what seems to have been substantially all of the family property would have been a matter of too great family concern not to have been known to some or all of the children. Furthermore, the settled and universal belief of all the old people of the neighborhood (who now are mere carriers of a tradition) probably had some basis which is now obscured by time. In such circumstances the delay of 12 years seems to us unconscionable. It is not merely the ordinary 12 years from the time of a lawsuit back to the time of the transactions in question; but it is the 12 years intervening between the time of the lawsuit and a time when witnesses, who possibly were alive and in possession of important facts, were already at the verge of senility or death. When we note that more than half a century has elapsed between the transactions to be investigated and the beginning of the suit, we are impressed with the belief that the conduct of appellants in allowing 12 years to go by, during which their adversaries were resting in peace and taking no steps to investigate occurrences dating back to 1849 and during which much testimony was lost in all probability, was so unconscionable as to justify the chancellor in declining to heed their prayer.

The decree is affirmed.