## Richette v. Ajello

*Martin A. Herring,* for plaintiff.
*Charles A. Peruto,* for defendant.

MEYER, *J.,* Specially Presiding, December 6, 1974—Plaintiff commenced an action in equity to restrain his divorced and remarried wife from using his surname and to collect $18,500, $1,000 of which was alleged to be a loan and the remaining $17,500 the balance due on a contractual obligation.

Preliminary objections were filed to the complaint which need not be discussed, as it was agreed by the parties that the court should take testimony and resolve two issues:

1. Should defendant be restrained from the use of the surname Richette?

2. Should defendant be required to pay to plaintiff $18,500, or any part thereof?

Plaintiff is an attorney in the City and County of Philadelphia. Defendant is a Common Pleas Judge of the First Judicial District.

The parties were married in April 1958 and were divorced in August of 1971. Defendant had gained prominence as a lawyer, author, lecturer and judge and was known as Lisa Richette. She was elected a judge before her divorce. In December of 1973, defendant married Vero Ajello. She continues to use the name Richette, the surname of plaintiff, in her public and professional life.

Plaintiff contends that: (1) Defendant is precluded by reason of various agreements from using his surname; (2) defendant's use of his name causes him great embarrassment (this latter reason was not averred in his complaint); and (3) defendant can only legally use the name Ajello.

There is no question that prior to the divorce the marriage relationship of the parties had deteriorated greatly. Various agreements were entered into, one of which was witnessed by Judge Victor J. DiNubile, of the Court of Common Pleas of Philadelphia. Both parties were and are good friends of Judge DiNubile. His interest was in helping the parties settle their differences, but he had no recollection of any independent oral agreement prohibiting defendant from using the name Richette. Plaintiff admits that it was not stated in any of the written agreements that defendant would give up any right which she might have to the use of the name Richette, but says that she orally agreed not to use the name.

With the numerous written agreements, we think it unlikely that there would have been an oral agreement and find that the testimony does not support the contention that there was an oral agreement.

Over 100 years ago, one of the early women liberationists, Lucy Stone, known then as suf-

fragettes, refused to use her husband's name. More and more women today are concerned with maintaining their own identity after marriage. There are many reasons for this. To name a few, women who have jobs find it less confusing to continue to use the same name by which they are known to their associates, clients, patients, etc. Many have established credit and want to have an' independent credit rating, and do not want to go to the trouble of changing Social Security cards, driver's licenses and other forms of identification. There are organizations such as "NAME CHANGE" in Massachusetts and "WOMEN'S OWN NAME" in Illinois whose purpose is to advise women on their rights as to the use of surnames. Few performers on stage or screen are known by their own names before or after marriage. Many professional women do not use their husband's surname.

We have found no Pennsylvania case in support of plaintiff 's argument that the law requires defendant to use her present married name. If defendant had not remarried, she could have used the name Richette and if she were divorced from Ajello, she could retake her former name, Richette: Act of May 25, 1939, P. L. 192, as amended, 23 PS §98.

We are not required to decide in this case whether defendant may use the name of Richette in signing orders of court, in applying for a license to operate a motor vehicle or a passport, or in registering to vote.

Both parties have cited Falcucci Name Case, 355 Pa. 588, 50 A.2d 200 (1947), in support of their respective contentions. In this case, a Philadelphia attorney of some prominence objected to Falcucci's right to use his name. The lower court permitted the change of name and an appeal was taken. The court said, inter alia:

"At common law no individual has such a property right to his name as to entitle him to prevent another from adopting it, unless his doing so had such a fraudulent purpose as would justify equitable restraint. Lord Chelmsford said in Du Boulay v. Du Boulay, 16 English Reports 638 (1869): 'The right to the exclusive use of a name in connection with a trade or business is familiar to our Law; and any person using that name, after a relative right of this description has been acquired by another, is considered to have been guilty of a fraud, or, at least, of an invasion of another's right, and renders himself liable to an action, or he may be restrained from the use of the name by injunction. But the mere assumption of a name, which is the patronymic of a family, by a Stranger who had never before been called by that name, whatever cause of annoyance it may be to the family, is a grievance for which our Law affords no redress.' "

Plaintiff suggests that because the court found that petitioner and respondent were not in the same business or profession and did not move in the same social circles, the court's holding would have been different if the factual situation were as in this case. We come to no such conclusion. While it is true that plaintiff and defendant were lawyers and did and do on occasion associate socially with the same persons, it is inconceivable to us that anyone would be misled into believing that Lawrence Richette and Judge Lisa Richette are one and the same person.

The only reason defendant could have for the continued use of the name Richette is that she is known professionally by that name rather than by her maiden name or her husband's surname. We do not

find any fraudulent purpose or intent to deceive on defendant's part in her use of the name Richette.

Plaintiff says in his brief that while he finds no Pennsylvania cases directly in point, the law is clear and fixed throughout the country that, upon marriage, a woman abandons her maiden name in favor of her husband's surname. To support this contention, he has cited a number of cases. We will examine a few of these.

The first, Brown v. Reinke, 159 Minn. 458, 199 N.W. 235 (1924), holds only that in law a married woman's name consists of her Christian name and her husband's surname. Pooler v. Hyne, 213 Fed. 154 (C.C.A. 7, 1914), cert. denied, 238 U.S. 620 (1915), held that, in Indiana, a suit to quiet title may be maintained against a nonresident married woman in her maiden name where she was last known in the State by that name.

Plaintiff quoted from Claxton v. Simons, 177 N.E. 2d 511 (1961), and People ex rel. Rago v. Lipsky, 327 Ill. App. 63, 63 N.E. 2d 642 (1945), but neglected to quote the material portions of these opinions insofar as this action is concerned. In Simons, the court cited with approval State of Ohio ex rel. Krupa v. Green, 177 N.E. 2d 616 (1961). In Krupa, Blanche Krupansky sought to have her name on the judicial ballot as a candidate for the office of judge. An action in prohibition was filed in which it was averred that she was married to Frank Vargo and, therefore, could not file as Blanche Krupansky. The writ was denied, and it was held that a person may adopt any name he may choose so long as such change was not made for fraudulent purposes. In the concurring opinion, it was said:

"Blanche Krupansky is the name by which the

candidate, here concerned, has been known all of her life. By custom, upon marriage, she may acquire the surname of her husband, but this does not prevent her from continuing to use her maiden name for any legitimate purpose so long as it is not fraudulently done or its use continued for a fraudulent purpose.

"If any question of public policy should be advanced seeking to hold that a married woman has been bound by custom to take the name of her husband in all events and for all purposes, there being no statute requiring it, it should be noted that the trend against the loss of the identity of a woman by marriage has received common acceptance. An examination of the statutes shows the trend toward emancipation of married women from the common law rules of bondage, from complete deprivation of all property rights, to that of being accorded the right to contract with her husband and others, to own property separate and apart from her husband, and to have the right of franchise, being limited only to the extent that her marital status cannot be changed or altered by common consent. From these facts, it must be evident that many unnecessary restrictive customs have fallen by the wayside. Certainly, if public policy sanctions commercial activities by married women, which of necessity are in no way concerned with her domestic life, then her family name, by which she is known in domestic circles, will not be harmed by whatever name she used in her commercial activities."

In People ex rel. Rago v. Lipsky, supra, one Antonia Rago, an attorney, held a certificate of admission to several courts. She was listed under that name in the telephone book and legal directories. She desired to register to vote under that name,

even though she was married to one MacFarland. It was held that, in Illinois, the Election Code required voters to register under their married names, but as to Antonia *Rago* said: ". . . *she is of course at liberty to use any name that she chooses* . . ." (Emphasis supplied.)

We find that a person has the right to use any name he or she chooses so long as there is no intent to deceive or defraud. There is not a scintilla of evidence that Judge Richette has any such intent.

We turn to the claim for money damages arising out of an agreement of plaintiff to pay $20,000 toward the support of the son and an alleged loan of $1,000. The original agreement was that defendant was to pay one half of their son's maintenance, support, vacations and education until $20,000 was expended. Thereafter, plaintiff was to be responsible. This was amended because of plaintiff's financial stress by a letter from defendant to plaintiff which both parties signed. In the amendment, defendant agreed to pay $20,000 in installments of $2,500, the first of which was paid. Plaintiff asks that defendant be required to pay the remaining $17,500, even though $10,000 is not due presently and there is no acceleration provision.

There were important conditions in the amendment. There was to be no harassment of defendant or their son concerning the ownership and contents of 1918 Lombard Street; plaintiff was not to discuss with the son defendant's relationship with her friends and specifically Vero Ajello; plaintiff was to maintain a sophisticated attitude and accept the realities of their situation, and they were to strive to provide the most harmonious interaction possible in order that the son might never again be exposed to tension and stress.

We will not review any of the testimony. It is enough for us to say we find that plaintiff did not keep his part of the agreement in that he had not maintained a sophisticated attitude nor has he accepted the realities of the situation, and, therefore, defendant is not required to keep her part of the agreement.

It was plaintiff's burden to prove by the weight of the evidence that the $1,000 paid to defendant was a loan rather than a campaign contribution. This he failed to do. Defendant listed the $1,000 as a campaign contribution when she filed the report required of candidates for public office. Plaintiff did not show that he paid any personal property tax on the amount said to be a loan. We elected to believe defendant that it was a campaign contribution.

We suggested to the parties that we dispose of any support rights that we thought were bound to arise in order that they might not be subjected to any more publicity. The parties declined, and we were precluded from determining any legal duties of support which are not dependent on contract.

## CONCLUSIONS OF LAW

1. Defendant may not be restrained from the use of the name Richette.

2. Defendant is under no legal obligation to pay plaintiff $17,500, or any part thereof.

3. Campaign contributions are gifts and not recoverable.

## DECREE NISI

And now, December 6, 1974, the prayers of plaintiff (1) for an injunction to restrain defendant from using the name Richette, (2) that defendant be compelled to return $1,000 averred to be a loan

from plaintiff, and (3) that defendant pay to plaintiff the sum of $17,500, the balance owing on an agreement are refused.

The prothonotary is to notify the parties and their attorneys of the date of the filing of this adjudication.